Filed 4/14/14  In re Jose G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JOSE G., JR., a Person Coming Under the Juvenile Court Law. | B249867 (Los Angeles County Super. Ct. No. CK96897) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE G., SR.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kim Nemoy, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The father, Jose G., appeals from the April 24, 2013 jurisdictional and dispositional orders. The father argues the jurisdictional findings under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b) were not supported by substantial evidence. The father also argues the dispositional order must be reversed. We affirm the jurisdictional and dispositional orders as they are supported by substantial evidence.

# II. PROCEDURAL HISTORY

On December 11, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of 15-year-old J.G. The petition alleges the father and the mother, S.G., physically abused the child and were unwilling and unable to provide care and supervision for the youngster. On December 12, 2012, the juvenile court ordered the child detained from his parents and placed in foster care. On January 18, 2013, the juvenile court issued a protective custody warrant for the child after he ran away from his placement. On January 30, 2013, the juvenile court recalled the protective custody warrant. The department was allowed discretion to release the child to the parents pending future hearings. On February 4, 2013, the juvenile court issued a second protective custody warrant for the child after he ran away again. On February 21, 2013, the child was released to the parents on the condition they comply with the case plan.

On April 24, 2013, the juvenile court sustained the petition under section 300, subdivisions (a) and (b). The juvenile court found the allegations in counts a-1 and b-1 true: "On 11/29/2012, the [father] physically abused the child Jose striking the child's face with the father's fists causing the child to sustain a bloody nose and mouth. The father forcefully placed the father's hands around the child's neck and forcefully dragged

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

the child towards a door. The child laid on the floor and grabbed hold of a door frame in order to stop the father from taking the child home. On numerous prior occasions, the father struck the child's face and body with the father's fists. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child is afraid of the father due to the physical abuse of the child by the father. The mother . . . failed to protect the child when the mother knew that the child was being physically abused by the father. On 11/29/2012, the father was arrested for Willful Cruelty to Child; Possible Injury/Death; Corporal Injury to Child and Child Abuse. Such physical abuse of the child by the father and the mother's failure to protect the child endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger, physical abuse and failure to protect."

The juvenile court also sustained counts a-2 and b-2: "On numerous prior occasions, the [mother] physically abused the child . . . striking the child's body with a frying pan and objects that are in reach of the mother. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child refuses to reside in the child's home due to the physical abuse of the child by the mother. The father . . . failed to protect the child when the father knew that the child was being physically abused by the mother. On 11/29/2012, the mother was arrested for Child Abuse. Such physical abuse of the child by the mother and the father's failure to protect the child endangers child's physical health and safety and places the child at risk of physical harm, damage, danger, physical abuse and failure to protect."

In addition, the juvenile court found the allegations in count b-3 were true: "The [parents] are unwilling and unable to continue to provide ongoing care and supervision of the child . . . . On 12/06/2012, the mother and father requested the child's removal from their home and care. The parent[s'] unwillingness and inability to provide care and supervision of the child endanger the child's physical health and safety and places the child at risk of harm, damage and danger."

During the disposition hearing, the juvenile court removed the child from the parents' custody. The juvenile court found: "The Court finds by clear and convincing

evidence remaining in the home of the parents would pose a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being. [¶] There is no reasonable means other than removal to protect the child. Remaining in the home of the parents is contrary to his welfare. [¶] Reasonable efforts were made to eliminate the need for the child's removal from the home." The parents were allowed weekly monitored visits, with the department not allowed to liberalize the visits without juvenile court permission. The department was ordered to provide the parents with family reunification services. The father was ordered to complete an anger management program. In addition, the parents were ordered to complete parenting education and family and individual counseling. The child was ordered to have: a psychological evaluation; weekly individual counseling; and conjoint counseling with the parents. The father filed a notice of appeal on April 24, 2013.

## III. EVIDENCE

### A. Detention Report

The December 11, 2012 detention report was prepared by children's social worker Maria Vega. On November 30, 2012, Ms. Vega received a referral alleging physical abuse and general neglect of the child and S.G., age 10. The detention report states: "The referral stated that there was an altercation between the father . . . and the child. . . . The father dragged the child out of the child's girlfriend's home and punched him at least once." The parents were arrested. The mother denied witnessing any physical altercation. At 11:15 p.m. on November 30, 2012, a temporary restraining order was issued which identifies the child as the person to be protected. The child was taken into custody and released to William M. William is the child's adult brother.

On December 5, 2012, Ms. Vega spoke with Kristine Castro, the child's school counselor. Ms. Castro called the child into her office to speak about his poor grades. According to the detention report, "The child disclosed to the counselor that the father

4

has always hit him and it became more physical when he turned 12." The child was afraid to go home once the emergency protective order expired on December 6, 2012 at 5 p.m. According to Ms. Castro, "[The child] was afraid to go home because he feared the father would hit him again."

Ms. Vega interviewed the child on December 5, 2012. The child said his mother gave him permission to go to the mall with friends. While he was eating, his mother called and inquired about his whereabouts. The child said he was still eating and would be home at 9:30 p.m. He stated the mother threatened him saying, "[The child] would have deal with his father upon his return." Ms. Vega summarized their conversation, "The child stated he ran away because he didn't want to be hit by the father." According to the child, the father did not hit anyone else in the household.

The child stated he was staying at a friend's house when his parents appeared. The father was upset the child was there. The father punched the child in his face. The child stated the police were called. The child was driven to the police station. The child stated he did not want to live at home and would rather go into foster care.

Ms. Vega also interviewed the child's sister, 10-year-old S.G. S.G. stated she was not present during the incident. S.G. denied any physical abuse by the parents and stated she had never witnessed any hitting. S.G. stated the mother was devastated when the child ran away from home. S.G. and the mother looked for the child at his girlfriend's house every day. They knew the child was at his girlfriend's house because they saw his bike outside. The mother went to the girlfriend's home and asked for the child. The mother was told he was not there. However, S.G. knew the child was there because he posted a picture of himself on the Internet. And S.G. recognized the girlfriend's apartment in the background of the photograph. S.G. also stated the child had pierced his ears without their parents' consent.

On December 6, 2012, Ms. Vega interviewed the child's adult brother, William. William was not present during the incident. But William did not believe the father hit the child. William was raised by the father from the age of five and was never hit or spanked. William had never seen the father act aggressively towards the children. In

5

William's opinion, the child was being influenced by Charity, his girlfriend. In William's view, this was because the parents did not have problems with the child in the past before Charity came on the scene.

Ms. Vega also interviewed the father on December 6, 2012. The father stated the child ran away and had been missing for a week. The parents did not report him missing because they did not want the child to get in trouble. The parents went to Charity's apartment after they found out he was there. Charity's grandmother answered the door and stated, "[The child] is not here but you can come in and check." The mother went into the bedroom and the father followed her. The child was under the bed but he ran out when the bedroom door was opened. The father stated neighbors were upset at the commotion and called the police. The police came and arrested the parents. According to Ms. Vega, "[The father] stated he loves his son and cares about him otherwise he would not have been at the apartment looking for him."

The mother stated she was very worried when the child was missing on November 24, 2012. The mother showed Ms. Vega text messages between her and the child the day he was first missing. The mother asked the child to return home but he refused, stating he was 15 years old. Ms. Vega did not see any threats in the mother's text messages about the child having to deal with the father. The mother explained the child told her he was at an unidentified best friend's home watching a game. She went to the best friend's house to wait for the child. But the child never came out of the best friend's home. The mother contacted the best friend's mother who stated the child had not been in their home. The mother passed by the girlfriend's house and saw his bike was outside of the home. The mother went to the girlfriend's home and Charity stated the child was not there. The mother asked Charity why the child's bike was outside. Charity replied the child had taken off walking. The mother knew it was a lie because the child did not like to walk anywhere. The mother returned to Charity's house daily. But Charity and her family kept denying the child was in the home.

On November 29, 2012, S.G. showed the mother a picture the child had posted on Facebook. The mother stated the picture showed the child without a shirt and with his

ears pierced. He appeared to be at Charity's home. The mother and father went to Charity's home after seeing the picture. Charity's grandmother answered the door and stated the child was not there. The mother's version is as follows: the grandmother allowed the parents in the home to check for themselves; the mother stated the child was hiding under the bed so the parents told him to come out; as they were walking to the front door, the mother turned to confront Charity about the lying; when the mother did this, she heard a commotion and saw the police outside; the mother did not see what happened but she did not believe the father hit the child; the mother stated the child has a very sensitive nose and bleeds easily; and the mother also stated before this incident, the child had been sneaking out of the house to spend the night at Charity's home.

On December 6, 2012, Ms. Vega held an emergency team decisionmaking meeting with the parents. The parents agreed the child should be detained as he was incorrigible and they could no longer deal with him. The parents stated they feared the child would call the police again to make false allegations of physical abuse against them.

The police report attached to the detention report described the investigation of the November 29, 2012 incident. At around 8:04 p.m., two officers were dispatched to an apartment in Arcadia. When they arrived, one officer observed the child was bleeding from the nose and mouth. The child stated he ran away from home because his parents were physically abusive. He had been staying with a friend in West Covina without his parents' knowledge. The police report states, "[The child] stated that for approximately three years on a weekly basis, his father has struck him in order to release his anger." His mother also hit him with objects, including a frying pan, when she was angry with him. The officer observed the child was visibly distraught. The child began crying when he described the physical abuse.

According to the police report attached to Ms. Vega's analysis prepared for the detention hearing, the child sent his girlfriend a message on Facebook. He asked to sleep under Charity's bed because he did not want to return home. Charity agreed and the child arrived at her home around 8 p.m. Shortly thereafter, the parents arrived at Charity's home because they saw the child's Facebook post. The child stated his parents

7

knocked on the door and came into the home to find him. The child stated he crawled out from under the bed. The father grabbed the child's neck. The father then forcefully dragged the child to the front door. The child laid on the floor and attempted to grab the doorframe. The police report explains, "[The child] . . . attempted to grab hold of the door frame in order to stop his father from taking him home." The father struck the child in the face twice with his closed right hand. The child stated the mother stood next to the father. She did nothing to stop the father from hitting the child. When the child yelled for someone to call the police, the mother responded, "If they call the cops, they'll take you away."

One officer spoke with the child's girlfriend, Charity. She stated the child had run away from home last week because his parents were abusive. Charity said the child had told her numerous times that he was afraid to go home because his parents hit him. Charity reported the child arrived at 8 p.m. after she agreed to let him sleep under her bed. He used the restroom and immediately hid under Charity's bed. When the child's parents knocked on the door looking for him he got out from under the bed. Charity stated the father dragged the child to the front door. The police report states Charity related the following, "The father dragged him to the front door by squeezing the sides on his neck with his hand." The child laid on the floor because he did not want to leave with his parents. The father then struck the child once in the face with a closed right fist. The father then tried to force the child up. This all occurred while the mother stood over the child yelling at him. Then, the mother tried to forcefully stand the child up and attempted to remove him from the residence. Charity said the father said the door hit the child. The father claimed to Charity this caused the child's bloody nose and laceration.

An officer interviewed Charity's grandmother. The grandmother stated she was watching television around 8 p.m. when she heard a knock on the door. The mother and father were at the door looking for the child. Charity stated the child was under the bed. The child came out from under the bed. The father removed the child from the room. The father's hands were around the back of the child's neck. The grandmother returned to her bedroom and did not see anything further.

8

An officer also interviewed Charity's sister, Lacey L. Lacey saw the mother yelling at the child. Lacey saw this as she exited the bathroom. Lacey then went to the living room and sat on the couch. Lacey saw the father strike the child once in the face with a closed right fist through the reflection of a mirror on an adjacent wall. Lacey then returned to her bedroom.

An officer interviewed Kristina Anderson. Ms. Anderson lived across from Charity's apartment with a clear view of the front doorway. Ms. Anderson stated she was cleaning her patio area when she saw the child arrive at Charity's apartment. She saw the child enter the apartment. A short time later, Ms. Anderson saw the child laying near the door attempting to hold onto the doorframe. The father attempted to remove the child from Charity's apartment. According to Ms. Anderson, the father did so by pulling on the child's collar. Then the father struck the child in the face once with a closed right fist. The mother stood over the child yelling, "If you tell the cops, you'll be taken away."

Finally, an Arcadia police officer interviewed the mother. The mother said the child ran away from home and had been absent for over a week. The mother saw a picture of the child on Facebook. He appeared to be at Charity's apartment. The parents went to Charity's home to look for the child. The grandmother allowed them to enter and they found the child climbing out from under Charity's bed. According to the mother, the father grabbed the child by the shirt collar. The father was going to escort the child out of Charity's residence. The child resisted and shouted obscenities at his parents. The mother stayed in the bedroom with Charity's grandmother. The mother and Charity's grandmother were arguing about the situation. The father and child moved towards the front doorway out of the mother's sight. The mother left the bedroom when she heard sounds of a physical altercation. She saw the child on the floor with a bloody nose. The child was holding the front doorframe. The father was gripping the child's waist with both hands. This was done in an attempt to pull the child outside. The mother did not try to stop the father at any time during the fight. Instead, she shouted at the child, "Why are you doing this[?]" The mother was extremely angry and frustrated with the child to the point where she could, in her words, " . . . hit him with a belt." However, the mother

9

denied she or the father ever hit the child. Based on the interviews, the officers concluded the father hit the child in the face with a closed fist causing the child's injury. The father was arrested and charged with: battery; corporal injury to a child; and child abuse. The mother was arrested and charged with child abuse for failing to protect the youngster.

## B. Jurisdiction And Disposition Report

The January 30, 2013 jurisdiction and disposition report indicated the child had run away from his placement. The child occasionally texted William from other people's cell phones. But the child did not say where he was staying.

The father was interviewed by Stephen P. Carey, a dependency investigator, on January 18, 2013. The father denied ever hitting the child. The father reported the child went missing the week before on Saturday. On Monday morning, the father received a telephone call from an unidentified Arcadia Police Department employee. According to the caller, the child was at Charity's home. The child was found standing on a trash can attempting to enter Charity's apartment through a window. The child was picked up for truancy and returned to school. The child did not return home after school that Monday. The mother drove around all weekend looking for the child. The mother asked Charity about the child's whereabouts. The mother also asked Charity's grandmother where the child could be found. Both denied the child was at their apartment.

The father described the November 29, 2012 incident: "On Thursday night, I'm in bed. My daughter shows my wife a picture of my son on Facebook. He has piercings in both ears, which was out of character. My wife recognized the apartment and the picture was just posted ten minutes before. We go over. Knock. Her grandmother opens the door. Charity's bedroom lights were on. Someone looked out the window and then turned out the lights. Her Grandmother said he's not there, and invited us in. I came in three feet. My wife followed the grandmother to Charity's room. I stayed by the front door. They were knocking on her door, and Charity finally opened. My son was hiding

10

under the bed. There was a commotion. Charity and her grandmother were yelling. My son came out from under the bed. I'm at the door. He tried to run for the door. He didn't want to go home, obviously. What I can recall, he ran into the door trying to get away from me. It happened so fast. I tried to hold him from running out the door. He was acting hysterical. He dropped to the floor and was holding the door. He was acting hysterical and saying 'Why are you hitting me?' when no one was hitting him. My personal opinion is he was acting out so he could stay with his girlfriend. . . ." As for the police report, Mr. Carey, the dependency investigator, wrote, "[The father] stated he felt the police 'had it out' for him." He reported the people across from Charity's apartment were outside and had been drinking. The father denied the mother hit the child. The father stated: "'That's from some comedy or a movie. A frying pan? Are you kidding? My son is 15 years old. If there was any abuse of any kind, he would have told a teacher, coach or someone. He's a smart kid.'"

The father denied the allegation that the parents were unwilling or unable to provide care and supervision. The father stated: "'No. We want him home. When all this happened, we were on a hundred thousand dollar bail, each. If my son has this mentality, he could make something else up and we go back to jail. He's our son. We need to get him back on the right path. I don't care about anything else right now. [¶] Whatever happens now, we have to deal with this as a family long after you're gone. If we lose him now, we'll be visiting him wherever- in jail or on the streets. . . . [¶] We're okay with whatever supervision. We want him home. Here, we know he's safe, fed, and going to school.'"

The mother denied the father hit the child. The mother stated: "'I was in my room, researching on my computer why do kids run away. [S.G.] came in with a picture of [the child] from Facebook. . . . So we go over [there]. My husband didn't want me to go over, but I talked him into it. [Charity's] grandmother let us in and we waited by the door. The Grandmother goes into Charity's room and they start yelling at each other. I walked over to the front of her bedroom door. My husband is with me. I saw [the child] come out from under the bed. Charity and her grandmother are still yelling at each other.

He squeezes himself between me and the door. My husband is right there. [The child] walked out first. My husband walked out behind him, with his hand on his back ([the mother] placed her flat hand on her back at the base of the neck and next to her shoulder to show where he had his hand on her son). I never saw him dragged out. That was impossible because I saw him walk out the apartment. The grandmother and Lacey and Charity were still in the room going at it arguing. I started walking out, but I went back to the room and stepped in and told Charity how could you do that to me. When I left I heard a noise. I never thought my son would put up a fight. He has no reason to leave. He ran out. My son was on the ground holding the door. He was defiant, not wanting to leave. My husband was behind him, outside the apartment. He was trying to pull [the child] up by his armpits. My husband wasn't really trying though because [the child] was too stuck. I lifted [the child's] chin and told him to look at me. I bent down screaming what are you doing? Why are you doing this? He would never look at me in the eyes. . . . My son was screaming, 'You just saw your husband hit me and you didn't do anything.' He kept saying, 'He hit me. He hit me," really loud. My husband said, 'What, I hit you?' [The child] said, 'Yeah. Look at my nose.' My husband said, 'You hit yourself on your way out here.' I asked my son, 'Why are you doing this? You can get in trouble running away.'" The mother denied she hit the child. She stated: "He was never spanked. Neither of us ever spanked our kids. My husband doesn't do much discipline." The mother stated she loved her son and wanted him home.

The mother said the child had been involved in several incidents. When the child was 14, he was playing basketball in the park. The child was punched in the face. The mother admitted the child was loud and obnoxious and might have provoked the unidentified assailant. The mother stated the child was expelled from middle school for smoking marijuana, "trying acid" or "taking [some] pills." The child was expelled from Arcadia High School for possessing a knife at a football game. The mother reported the child was punched in the face by one of the football players. The child was knocked down to the ground. The child threw the knife in the trash can but someone saw it and reported the incident. Recently, the mother received a call from the child's high school

12

principal. The principal reported the child and Charity had been involved in a physical altercation at school. The principal reported the child and Charity were often in verbal altercations, breaking up and getting back together.

C.P. had known the child for two years. They were friends at one time but had drifted apart. He stated they used to be close friends. C.P. had no recent contact with the child. C.P. said, "'I haven't had any contact with [the child] since he ran away." Mr. Carey wrote: "[C.P.] states [the child] never said anything about his parents mistreating him."

## C. Supplemental Report

The supplemental report dated February 28, 2013, was completed by Mr. Carey. Mr. Carey interviewed the child at the Children's Court on January 30 2013. The child had run away from his placement and been missing for weeks. The child stated: "I ran away from home. They found me at my girlfriend's house. I didn't want to go home because I knew I'd get grounded. I tried running out of the house and ran into the door. My parents said let['s] go home." The child reported he "made up a lot of the stuff that night" and even after November 29, 2012. The child was asked to describe what happened on November 29, 2012. He said: "'I hid under the bed. My parents came to the front door. Both of my parents were at the bedroom door. I ran out of the bedroom past both my parents. I tripped and ate it, face-first into the front door. Nobody saw. Then my parents came. They opened the door. I was too dazed to get up. Everybody heard the commotion. Someone called the police. I had a bloody nose and said I wasn't going home and was staying here. Police came. They started interviewing everyone. Charity, Lacey, and I were sitting on the couch while police interviewed my parents. I told Charity and Lacey to say what I was saying so it would be believable. They took pictures. They took my parents away.'" Mr. Carey observed the child smiled and showed no understanding of the seriousness of the current situation during the interview. The child expressed no regret or remorse.

13

The child ran away from his new foster home and was missing until February 11, 2013. On that day, he appeared at the Pasadena courthouse for a hearing to lift the criminal protective order issued against the parents. On February 12, 2013, the department set up a safety plan that included wraparound services for the child and counseling for the parents and the child. Mr. Carey recommended the child be placed in the home of the parents with family maintenance services.

Mr. Carey interviewed Charity's grandmother. The grandmother stated: "'[The child] pulled a knife on me and my granddaughter after the holidays. Skye found him under Charity's bunk bed. She pulled him out of the room and tried to hold him until [the] police got here. Their struggle went into the kitchen, and he pulled a big kitchen knife out of a drawer and held it to Skye's neck. She was saying, 'Go ahead, do it.' I was scared, and I hit him with my crutch. I just had surgery on my foot. I thought he was gonna come after me and I backed off and said to just leave, leave. He ran out without his shoes, and with our knife. He was running down the stairs just as our manager was coming up the stairs.'" The apartment manager reported seeing the child run out of the dwelling holding a large kitchen knife.

S.G. stated her parents disciplined [the child] by taking away his Play Station, cell phone and television. The parents also made the child do extra chores. S.G. said: "'They aren't the type to do what he said. They're more the type to ground him. We were shocked. It's not like anything like this would ever happen.'"

Mr. Carey interviewed the grandmother's neighbor, Ms. Anderson. Ms. Anderson saw the father hit the child: "'My boyfriend and I were out cleaning my back patio, which is directly across from their apartment. We saw [the child] standing looking in the window. I recognized him because he's there a lot. I looked again, and he was gone. I assumed they let him in. A few minutes later, I heard his parents were there looking for him. They went in. A few minutes later, I saw him on the ground holding on to the door [jamb]. He didn't want to leave, and his father was bent over trying to pull him off. With one hand, he was pulling, and with his other, he punched him in the face.'"

Ms. Anderson also stated: "'[The mother] was standing directly behind the father when it happened. I can't say 100% she saw it, but there's no way she couldn't have seen it.'"

## D. Section 241.1 Report

The April 9, 2013 report indicated the child was released to his parents. The report states: "Initially, [the child] was detained and placed in foster care, but he went [missing] from several placements, and refused to be placed. [The department] believed [the child] would be safer in the home of his parents with Wrap Around services in place than being on the streets." The report also indicated the child's behavior was of concern. The report further states: "On 1/17/13, [the child] held a kitchen knife up to a woman's throat and threatened to slice her throat and kill her. [The child] has recently been seen at Temple City High School threatening other students and carrying a weapon. [The child] went [missing] from several [department] placements, and he refused to be placed."

## E. Testimony

At the adjudication hearing, the juvenile court heard testimony from Ms. Anderson, the father and the child. Ms. Anderson's residence faced Charity's second-story apartment. Ms. Anderson's apartment was 30 feet away across the pool. Ms. Anderson's balcony looked directly at Charity's front door and balcony. Ms. Anderson was cleaning her balcony when she saw the child. The child was waiting to get into Charity's apartment. Ms. Anderson testified it was evening and already dark outside. About 15 minutes later, the parents arrived and spoke with the grandmother. Ms. Anderson later heard a commotion and walked onto her balcony. She testified, "I witnessed the father sock the son in the face, and the son trying not to leave the house." Ms. Anderson only saw the father's back. This was because the child was in front of the father and they were both facing away from her. Ms. Anderson did not see the father's fist come into contact with the child's face. But, she saw the father's arm go around to

15

the level of the child's head. Ms. Anderson told the father he needed to leave. Then she called the police.

The father denied striking the child in the face. The father denied putting a hand around the child's neck and dragging the youngster. The father also denied the mother ever hit the child. The father testified the child had been missing for four to five days when they saw the child's picture on Facebook. They went over to Charity's apartment to bring the child home so he could attend school. The parents knocked on the front door and called out to the child. Ms. Anderson and the father exchanged words while the parents were outside Charity's apartment. The father stated Ms. Anderson was drinking with a group of people on her balcony. The grandmother answered the door and allowed the parents inside the apartment. The father stood in the living room while the mother went to Charity's bedroom. The child stated he was coming out but did not want to go home. The child ran out of the bedroom. The father tried to restrain the child from leaving the apartment. The father held onto the child's waist with both hands. The father testified the child ran into the halfway open front door. This occurred as the father was trying to hold the youngster. The father stated the child grabbed onto the door and started throwing a tantrum. The father then exchanged more words with Ms. Anderson who witnessed the commotion. The father stated it was about 8:30 p.m. and dark outside.

The child testified he ran away and was at Charity's apartment that day. Charity came and told him his parents were there while he was hiding under the bed. He stated he did not want to go home because he did not want to get grounded. The child denied the parents physically disciplined him. When the child came out from under the bed, he ran towards the front door. The child saw the father in the living room. The father tried to stop the child. The father grabbed the child on the waist. The child looked back trying to get the father's arms off. When the child turned around, he hit his face on the front door. The child denied either parent hit him. The child admitted lying to the police officers so he would not have to deal with the consequences of his conduct. The child also stated he lied to Ms. Vega who prepared the detention report.

16

## IV. DISCUSSION

### A. Jurisdictional Findings

Section 355, subdivision (a) provides: "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300. . . ." Section 300, subdivisions (a) and (b) state: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. . . . [¶] (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that: there was neglectful conduct by the parent in one of the specified forms; causation; and "serious physical harm or illness" to the child or "substantial risk" of such injury. (*In re B.T.* (2011) 193 Cal.App.4th 685, 692; *In re Ricardo L.* (2003) 109 Cal.App.4th 532, 567.)

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426,

17

1433.)  We review a removal order for substantial evidence in the light most favorable to the juvenile court's order to determine whether sufficient evidence supports the court's findings by clear and convincing evidence.  (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.)  Substantial evidence is relevant evidence which adequately supports a conclusion.  It is evidence which is reasonable in nature, credible, and of solid value.  (*In re E.B., supra,*184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at p. 1433.) We draw all reasonable inferences from the evidence and adhere to the principle that issues of fact, weight and credibility are the provinces of the juvenile court.  (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L., supra,* 109 Cal.App.4th at p. 564.)

The father argues the jurisdictional findings under section 300, subdivisions (a) and (b) were not supported by substantial evidence.  This contention has no merit.  He concedes the juvenile court found Ms. Anderson's testimony "very credible" but nonetheless challenges her testimony.  The father argues Ms. Anderson did not actually see the child being punched.  In addition, the child acknowledged he told Charity and Lacey what to say to the police and admitted he lied about the parents hitting him.  These contentions are improper efforts to have us reweigh the evidence.

Substantial evidence supports the jurisdictional findings.  The Arcadia police officer stated the child was visibly distraught and crying while describing the physical abuse.  The child said his parents were physically abusive.  For three years, the father struck the child on a weekly basis.  The mother hit him with objects within reach including a frying pan.  In addition, the child's high school counselor was interviewed.  The counselor related the child was afraid to return home after the restraining order against the parents expired.  As noted, the detention report states, "The child disclosed to the counselor that the father has always hit him and it became more physical when he turned 12."  Charity confirmed the child told her numerous times that his parents hit him and he was afraid to go home.  Charity saw the father drag the child to the front door.  The father grabbed the sides of the child's neck.  This was confirmed to the Arcadia police by Charity's grandmother.  The mother confirmed the father grabbed the child by

18

the shirt collar. In addition, three witnesses reported the father hit the child. Ms. Anderson, Charity, and Lacey told the officer they saw the father hit the child. Ms. Anderson testified she did not see the father's fist actually contact the child's face because they were facing away from her. But she saw the father's arm go around to the level of the child's head to "sock" the youngster. Finally, the parents gave inconsistent versions as to what occurred when the child was injured. The foregoing constitutes substantial evidence supporting the jurisdictional order.

## B. Removal Order

Section 361, subdivision (c)(1) provides: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . The court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." Section 361, subdivision (d) states: "The court shall make a determination as to whether reasonable efforts were made to prevent or eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based."

The purpose of section 361 is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee v. Superior Court* (2001) 26 Cal.4th 735, 749,

19

fn. 6.)  The juvenile court may consider both the parent's past conduct and the present circumstances.  (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)  We review a dispositional order for substantial evidence.  (*In re Noe F.* (2013) 213 Cal.App.4th 358, 367; *In re John M.* (2012) 212 Cal.App.4th 1117, 1125.)  The evidence we have adverted to in connection with the jurisdictional order applies equally to the determination to remove the child from the parents' custody.  There is no merit to the father's analysis which requires we reweigh the evidence.

V.  DISPOSITION

The jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

_____

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.